2012-1279, Henry Vegas Amusement. Mr. Vergasas? Vergasas. Vergasas, okay, thank you. Good morning, Your Honor. May it please the Court, my name is Michael Vergasas. I'm with me today is Igor Shortet. We're here to argue for a reversal of the Board of Appeals decision in the review of a final rejection and a re-examination proceeding. The principal focus of the appeal is a question of claim construction of whether or not the claims should be construed to include a single game processor device in a single interface device. So you agree that the general rule is that A doesn't mean one, it means more than one. Absolutely. And so you tell us that the spec here is so clear that it only includes a single one, that we ought to construe it more narrowly than the broad normal construction? Yes, Your Honor. In fact, since the briefing has been completed in this appeal, this Court has issued a decision in the case of Abbott Diabetes Care, in which this Court suggested that the PTO's requirement to express disavowal from the specification is not necessarily always the case required. But that case, with which I have some familiarity, that case didn't deal with an A or an and in the general rule, right? That dealt with another aspect of whether wires and cables were necessarily in or out. That's correct, Your Honor. So there wasn't kind of this rebutted presumption that you had to rebut. It was laid out somewhat differently, correct? The specific terminology at issue was different, and certainly there wasn't a general rule of the indefinite singular article being encompassing of plural members, components, et cetera. So why are we here? I mean, you could simply have amended your claims, as you did in some other patents, to make clear that this was limited to a situation where there was a single processor. Why didn't you do that? Because this patent is in litigation, Your Honor, and in that event, there would be intervening rights that would release all past evidence. And so the patent owner is faced with a hot choice of sustaining the validity of the patent, which in a district court context, I think that this issue wouldn't come up. I think that the broadest reasonable interpretation wouldn't apply. But here in the patent office, we're faced with the broadest reasonable interpretation. So in the circumstance intervening rights would apply, notwithstanding, I presume, in the litigation, your construction is that it's only a single. So the infringement contentions in that case only involved a single. But intervening rights would still come into play just because of the amendment? In the case where the amendment is required to confirm patentability in the reexamination, Section 251 and 252 would create intervening rights to eliminate damages for the period prior to the grant of the reexamination certificate. And that's why we're here, Your Honor. Going back to the Abbott case, though, I think that the place where the patent owner believes that the decision in that case is particularly persuasive in this case is that there was a question of disparagement of a prior art configuration, and in particular with regard to the use of the cables and wires as being cumbersome to the patient using that particular medical device. In this particular case, the specification disparages, not necessarily by name, but by structure, the two principal prior art references that the patent office is relying upon for the final rejection, both in the anticipation and the obviousness. So in Column 1, lines 47 through 50 refer to custom circuitry, which is the Takashima reference, and in Column 2, lines 25 through 36, it refers to a network of personal computers, which is the construction of Morris prior art record. And in the first paragraph following its description of the prior art, the patentee said, the present invention recognizes and addresses the foregoing disadvantages and others in prior art construction and management. And so, immediately, we're faced with a situation where the patentee was aware of the prior art, understood its shortcomings, and presents an invention that's considered… Maybe I'm misunderstanding the specification, but it seems to me some of the statements in the specifications you rely on are distinguishing prior art based on whether multiple players can play a game interactively, and not whether the games use one or more multiple processors, right? Columns like lines 5 through 15 in Column 1, as you cited. And so, this is a situation where there is a single embodiment described in which there's a personal computer that has a single processor, and we've asked the court to take judicial notice of the state of the art at the time of personal computers as having only one processor. This application was filed in 1995, and at that time, a personal computer did not have more than one processor. So, from the perspective of a person of ordinary skill in the art, when you read the claim annotation that says a personal computer assembly, a person skilled in the art in 1995 would understand that to be a single processor device. So, in the event that the court determines that the patent office's broadest reasonable interpretation is incorrect, and adopts the proposed construction that we're advancing of a single gaming device processor and a single interface processor, the board still found that there was a basis on which there was an obviousness rejection based on Morris combined with Wilson or Takashima. And I think we need to look at what that rejection is based on, because I don't think it's very well-founded. In the PTO's brief at page 34, there's a block quote, and this is the basis on which the board found that there was a teaching in the art to condense or combine functionalities into a single processor. And I would submit that this is really an invitation to invent and not a disclosure of the claimed system. So, almost in a boilerplate fashion, but slightly a modification from the standard boilerplate, you see the patent specifications. It says, although a preferred system configuration has been described, and this is coming out of the Morris reference in which there were multiple personal computers in a distributed gaming system for lottery and not for card games. Although a preferred system configuration has been described, it will be appreciated by those skilled in the art that a number of different system configurations are possible without departing from the spirit and scope of the invention. As will be appreciated, the combination of components provided in the gaming system comprises an integrated computer system capable of operating an electronic lottery, gambling system, or other similar games. Each component of the gaming system provides a specific function necessary to the operation of the gaming system as a whole, where these functions can be further distributed or combined among other computer architectures. But it doesn't tell you how that could be done. It says, these are some possibilities, you can distribute further, you can combine further, but it doesn't tell you how to do that. And I would submit that that's an invitation to invent and not an enabling disclosure to support an obvious misrejection. The other aspect of this specification... Do you agree that if we were to conclude that these claims cover multiple processors that you'd lose on the obvious last question? Yes, there are. I would concede that. The other aspect of this specification that informs the claim construction, I believe, is the fact that in 1995, in order for players to play against each other as opposed to just against the dealer, in order to do that, you needed to funnel all of the input into a single device. And so that's why there's this effort to have an interface device that captures the input from several player stations and funnels it all into the same personal computer where the gaming program is residing. Because what had been going on in the prior art is that there were separate stations with separate computers, and each one of those stations played against the dealer. And they didn't necessarily play against each other. And so this case, or this invention, by funneling all of the input into a single personal computer running the gaming program, was able to provide the opportunity for people to play against each other and experience the feeling and the excitement of a casino game where you're actually playing against the other people at the table as opposed to just you and the dealer, which is almost like a single player device. Going back to the point that was made earlier, yes, the general rule is that the recitation of comprising followed by the single article, indefinite article A, captures plural devices. But there are also cases that say it's not a hard and fast rule, and the Harari case in particular finds that there are situations in which the language of the claims and the additional structure and limitations present in the claim can compel a different result than just the general rule. There's nothing in the language of the claims here that compels a different result, right? I would disagree with that. I would say that with regard to the limitations in the claim, the reason why that there's an interface assembly to what's the language of the specification that leads us away from the general rule? The disparagement of the priority in which there are multiple processors and the disclosure of a single embodiment in which there is a single processor in a gaming device and a single processor in the interface device. Well, that would still be within the claims, right? It's not as though that embodiment is being excluded. Oh, correct. Correct. It means that that's what the invention was. We don't do claim construction along those lines at all, right? That's not the principle. We're always cautioning against limiting the claims, limiting the invention to a single disclosed embodiment, right? That's correct. But there are also circumstances like the Abbott case and like the Ardeno case where the discussion and the way in which the inventor presents that single embodiment equates that embodiment with the invention rather than just to be an embodiment of the invention. Part of the prosecution history here is that I understand that other claims and other patents were amended to limit it to a single processor, right? What's the chronology of that? When did that happen in relation to the prosecution of this patent? Your Honor, the chronology is as follows. There was a litigation filed in the District of Nevada, and after the litigation was filed, the defendant in that case initiated reexamination of four patents. And the Patent Office granted the request for reexamination in all four of those cases. In three of them, after a final rejection and interviews with the examiners in the reexamination unit, amendments were filed in those three cases to explicitly decide on single processors. And that happened as a result of a different litigation than the one involved here? Yeah. No, the same one? The same one. All of these random reexaminations were pending at the same time. I see. Okay. But going to the point of is there something more than the specification to support this construction, I would say that the existence in the claim limitation – the existence in Claim 1 of the limitation in interface assembly, which its purpose is to collect input from multiple player stations to funnel it through to a single processor. I think that that is one of the key reasons why you can find a single processor, a game processor device, and also the personal computer assembly. As I said, the state-of-the-art at the time was a single processor and a personal computer. The language single processor is not in the claim, right? Oh, no. Right. I'll reserve my additional time. Okay. Thank you. Ms. Rasheed? May I please report? As David's term purpose pointed out, even if we adopt their claims instruction and limit the game processor device and interface processor device to one processor, the board and the examiner found that these claims would have been obvious and that it was well within the skill of an ordinary artisan to condemn functionality of the processors from multiple processors to singular processors. Well, can we start with the main argument, though, as to whether or not the broadest reasonable construction would – it would be okay to limit it? How do you distinguish this from INRI Abbott? Your Honor, this case is very different from INRI Abbott in that there – the claim language, the specification, and the prosecution history all kind of wind up behind the proposed construction. Here, we don't necessarily have that. Abbott, unlike this case, is not an instance where the specification would necessarily have to disavow an embodiment that would be otherwise covered by the plain language. Here, you would have to have the specification disavow the general ordinary meaning of a or an, meaning plural, in order for it to – So, you play on the – there are different rules – I mean, the rules of the game are different when we're talking about the general rule of a and an being singular. There, you need absolute disavowal, whereas if that's not the basis for broadest reasonable interpretation, you need a weaker disavowal or something of that sort. Is that the position you're taking? Your Honor, I think it's – I mean, the rule sets a very high presumption, and I think in order to overcome that, they would have to show a clear intent that what they meant was singular and not plural, and they haven't done that here. So, the specification, for example, would have to say, we are disavowing anything other than singular. Is that too much, or could it get away with talking about only we are covering a singular process, or would that be sufficient? What would be enough, do you think, to satisfy – would you say a disavowal would apply in this circumstance? I think in this case, they would have to say that it's superlative to a singular process, and that they would have to distinguish the prior art by saying that the prior art deals with multiple processes. Here, they've got their invention is – What about their disparagement argument? I mean, they argue that they do – they did disparage the prior art, and that's another way of disavowing what's covered. To the extent that they're arguing that there's some sort of implicit disavowal in those two sentences that are in column two of Morris, I don't believe that language they teach that Davis' invention was limited to single processes. I think the only thing that that language teaches is that it was intended to allow, as you pointed out, as Morris said, to allow for competition amongst players and to create a live casino-type game. And that was the alleged improvement over the prior art systems where players were playing multiplayer games, but they weren't playing against each other. They were all individually playing against one main CPU. And I think that's evident when you look at the background of the invention as a whole. The background of the invention starts off by saying that this specification particularly describes the invention – column one, lines five to eight – particularly describes the invention as an improvement in video gaming machines that permits the plurality of players to simultaneously participate in a game. A few lines down from that, he goes on to say that, quote, many video games are considered for single players, and he gives examples of that. And then it ends with saying, while popular, such games do not provide the group interactions found in live casino games. Also in their appeal brief to the board, Vegas described the prior art system, specifically Takashima, and they describe it incorrectly, but they describe Takashima as a system in which a player, each player's station, plays an independent game executed by the player's station and the game processor. And this is different from theirs, where they're simultaneously, quote, they actually say, this is a precise system that a patent owner disclaims, quote, unquote, and this is in their appeal brief. So it's clear that they were trying to distinguish between anything. They were trying to distinguish between simultaneous games where the players are competing against one another versus games where they're individual, independent games with the dealer. Can I just ask you a side question, which is sort of general, trying to understand the whole play of the consequences of what we do here? If we disagreed with the board here and said, okay, we'll let you have it. We think there was a sufficient disavowal. And he goes to assert this patent, you know, a few years down the road. Now, the risk and what the board's trying to guard against is that this would be asserted against more than one and not limited to a singular. Well, there's enough prosecution history in terms of what's gone down here in this re-exam to absolutely preclude it from doing that in any event. So is there a practical difference in terms of whether we affirm or reverse the board in this kind of circumstance? Do you understand my question? I do understand your question, Bidwar, and I think there is a difference because... I'm just a process. Oh, sorry. Okay, it's a compliment to be called, Bidwar. I think the difference is there is a practical difference because at the PTO, we're concerned with having claim clarity and identifying the scope of the claim, right? We can't be concerned about what happens later on in district court. We're concerned about the four corners of the patent and what that teaches the public and the notice function that that patent serves. And so our concern is to ensure that those claims are unlimited. And we do have that claim, but I was using that construction. Well, the difference is that you think the patent's invalid, that they over-claimed in the beginning and that they lose for that reason. I mean, Judge Prost is correct that in the future, they wouldn't be able to assert this against a multiple CPU unit. But the PTO's view is this patent should be invalid because they over-reached in the beginning, right? I mean, isn't that the answer? Yes.  That is the answer. I mean, I think no matter how you look at it, they did overreach. And not only is it invalid for that reason, it's also invalid for a host of other reasons that the board points out. Thank you. Thank you. We'll give you two minutes. Thank you very much. One of the things that I think it's—this is not my first time I've argued for a reversal of the broadest reasonable construction. And I have a fundamental difficulty with there being two standards, one for district court and one for the patent office. And I think that defendants in patent infringement litigation are able to game the system quite a bit by taking advantage— and then coming to the patent office where a different standard applies and getting a second bite at the apple. All of that being what it is, one of the things that I think that gets lost in this broadest reasonable interpretation analysis is the whole written description idea. The written description is different than enablement, right? And so written description says what did the inventor communicate to the world that he invented? Not what's obvious from what he described, right? I think that the Lockwood case and the Gentry Gallery case both talk about—in my view, the other variations may have been obvious from what the inventor taught, but he didn't say that he invented those things. And so in this particular situation, the patent office is taking the position that this inventor has a claim whose scope could encompass multiple processors. He didn't invent multiple processors. He said that multiple processors existed and I don't like them. They don't work very well. There are problems with them. I've invented something different. I've invented something that's— It depends how you read the specification as to whether that's what he said, whether he was saying I don't like multiple processors or I don't like situations in which people are not playing the same game but are playing different games, right? But with all due respect, there is no place where he teaches to use multiple processors. So he didn't invent a gaming system using multiple processors. And so to assign a scope of a claim for multiple processors flies in the face of Red Prescription. So your point is that—I mean, well, you would agree that it would be problematic for a panel of this court to go the way you're going on the theory you're going at because we've got cases that endorse and subscribe to the broadest reasonable interpretation method, right? I understand your argument. I mean, there are problems with—I mean, you know, we go through the same sort of tension in claim construction and validity and, you know, claiming broadly. And then you've got—you can do a claim broadly, but what? By doing that, you're messing up the whole patent for purposes of enablement or Red Description. We go through those kinds of tensions all the time. I don't think that the court—in following my argument about Red Description, I don't think the court would have to abandon prior precedent on broadest reasonable interpretation. Broadest reasonable interpretation has always been from this court that it has to be based on the specification. Broadest reasonable interpretation really isn't even involved in this case. It's whether or not A connotes plural as opposed to singular. And that's a rule that applies in the district court as well as the PTO. That's not a broad—I mean, broadest reasonable interpretation always, to me, is when the examiner looks at a word like, I don't know, fastener or bolt, and gives it a broader interpretation even than its ordinary meaning. This is an A, and, or, the case. So I'm a little lost as to why we should get anxious about the fact that there's a disparity between ordinary district court interpretation and PTO interpretation because of the broadest reasonable interpretation standard of the PTO. It's the same standard the district court would apply. I don't think this claim would have been an iota different if it had gone off in front of a U.S. district court. I've not been involved in the litigation, so I don't know whether there was claims—I don't believe that there was claims of obstruction. Yeah, but as there were. I mean, if this—if you were arguing in front of a U.S. district court that this patent was limited to a single process, you'd be making exactly the same arrangement you're making now. And nobody would be talking about a broader reasonable scope or whatever. There would be one difference, Your Honor. And I would submit that the district court would have to consider the presumption of validity and adopting a claim construction that would preserve the validity of the claim. We don't have—I mean, the rules have changed in that regard, too. I mean, there's—it's no more after Phillips that the instruction is that you construe a claim to preserve its validity, in most or all circumstances, for purposes of construing—of preserving validity. But I still think that the district court could be persuaded by the notion that if one claim construction preserves validity and one does not, then you can— That's a preference, but not a rule. All right. Thank you. Thank you, Your Honor. Thanks, both counsel. The case is submitted, and that concludes our session today. All rise. The case is submitted.